**Leroy BUNYON, Plaintiff,**

v.

**BURKE COUNTY; Gregory T. Coursey, Sheriff, Individually and in his Official Capacity as Sheriff of the Burke County Sheriff's Department; Johnny Patterson, Sergeant, Individually and in his Official Capacity for the Burke County Sheriff's Department; Robert L. Saulsberry, Sergeant, Individually and in his Official Capacity for the Burke County Sheriff's Department; Wayne Scott, Lt., Individually and in his Official Capacity for the Burke County Sheriff's Department; John H. Bush, Jr., Capt., Individually and in his Official Capacity for the Burke County Sheriff's Department; City of Midville; Bruce Anderson, Chief of Police, Individually and in his Official Capacity as the Chief of Police for the City of Midville; Leroy Morgan, Investigator, Individually and in his Official Capacity for the City of Midville Police Department, Defendants.**

**No. CV 102–007.**

United States District Court,
S.D. Georgia,
Augusta Division.

Feb. 24, 2004.

---

17. If the November election had been held as scheduled, no savings would have inured to the City in any case.

Wade K. Copeland, Richard M. Pierro, Jr., Carlock, Copeland, Semler & Stair, LLP, Atlanta, GA, for Plaintiff.

Maren R. Frost, Swift, Currie, McGhee & Hiers, LLP, M. Diane Owens, Christopher D. Balch, Swift, Currie, McGhee & Hiers, Phillip E. Friduss, Cynthia M. Daley, Hall, Booth, Smith & Slover, PC, Atlanta, GA, Michael G. Frick, Hall, Booth, Smith & Slover, PC, Brunswick, GA, for defendants.

## ORDER

BOWEN, Chief Judge.

Plaintiff Leroy Bunyon ("Bunyon") filed suit in the above-captioned case pursuant to 42 U.S.C. § 1983 against twelve defendants: (1) Burke County, Burke County Sheriff's Department, Gregory T. Coursey, Johnny Patterson, Robert Saulsberry, Wayne Scott and John H. Bush, Jr. (collectively "the Burke County defendants"); and (2) City of Midville, Midville Police Department, Bruce Anderson, Leroy Morgan, and Wesley Lewis (collectively "the Midville defendants").[1] Presently before the Court are two motions: (1) a motion for summary judgment by the Burke County defendants (Doc. No. 45) and (2) a motion for partial summary judgment by Bunyon (Doc. No. 57). For reasons stated more fully below, the Burke County defendants' motion is **GRANTED IN PART** and **DENIED IN PART.** Bunyon's motion for partial summary judgment against the Burke County defendants is **DENIED.**[2]

## I. BACKGROUND

Distilled to its essence, this case is about the events surrounding the arrest and detention of Leroy Bunyon and the allegedly poor medical care he received while detained in the Burke County Jail. The factual background and procedural history are recited at length in the Court's Order of September 29, 2003. In that Order, the Court held the following with respect to the Midville Defendants: 1) Bunyon suffered a violation of his constitutional right to due process because he was not taken before a judicial officer within three days of his arrest, and damages for such viola-

---

1. The Burke County Sheriff's Department, Midville Police Department, and Wesley Lewis have all been dismissed. (*See* Order of July 6, 2002, Doc. No. 31; Order of September 29, 2003, Doc. No. 108.)

2. Bunyon's motion with respect to the Midville defendants and the Midville defendants' motion for summary judgment were addressed in this Court's Order of September 29, 2003.

tion are to be determined by a jury; 2) Bunyon's claim of a due process violation because he was not allowed to post bail will go to trial; 3) Bunyon's claims that the City of Midville and Bruce Anderson, in his official capacity, are liable for unconstitutional policies of excessive detention of pre-trial detainees arrested on bench warrants and of refusing to accept bail for a pre-trial detainee will go to trial; 4) Defendants Morgan and Anderson are not entitled to the protection afforded by qualified immunity; 5) Bunyon's false imprisonment claim against Morgan and the City of Midville will go to trial; and 6) Bunyon's claim for punitive damages against the City of Midville is dismissed.

## II. REQUIREMENTS FOR SUMMARY JUDGMENT

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in [its] favor...." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears

the burden of proof at trial, that party "must show that, on all the essential elements of its case, ... no reasonable jury could find for the nonmoving party." *Four Parcels*, 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. City of Columbus*, 120 F.3d 248, 254 (11th Cir.1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark*, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* Again, how to carry this burden depends on who bears the burden of proof at trial. If the *movant* has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. If the *non-movant* bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively ne-

gating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Fitzpatrick*, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross*, 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The clerk has given the non-moving parties notice (Doc. Nos. 46, 58) of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. Therefore, the notice requirements of *Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motions are ready for consideration.

### III. ANALYSIS

Bunyon has brought both federal and state law claims. His claims arise out of alleged violations that occurred (1) because of his detention and (2) as a result of the allegedly poor medical care he received at the Burke County Jail. Because Bunyon was arrested by the Midville Police, but detained in the Burke County Jail, the defendants are effectively divided into two groups: (1) the "Burke County defendants"—Burke County, Gregory T. Coursey, Johnny Patterson, Robert Saulsberry, Wayne Scott, and John H. Bush, Jr.; and (2) the "Midville defendants"—City of Midville, Bruce Anderson, and Leroy Morgan. The liability of the Midville defendants was addressed in the Order of September 29, 2003. (Doc. No. 108.) I will now address the liability of the Burke County defendants.

### A. The Due Process Claim

Based on his arrest and detention, Bunyon asserts he is entitled to summary judgment on a constitutional claim of deprivation of his rights without due process.[3] (Doc. No. 57.) Bunyon asserts that because he was not brought before a judicial officer within the time prescribed by law, or permitted to post bond following his arrest on March 13, 2001, his right to due process was violated. (Doc. No. 60 at 21–23.) Bunyon claims that Burke County is liable for this violation because it had a custom, policy, or practice of deliberate indifference to such rights. (*Id.*)

The applicable federal and state law on due process has been set forth in

---

**3.** Bunyon also moved for partial summary judgment on another constitutional claim and a state law claim. With respect to the constitutional claim, he asserted that because no one gave him an opportunity to post bond following his arrest, Defendants violated his right to be free from excessive bail as established by the Eighth and Fourteenth Amendments. However, because Bunyon did not address this issue in his brief, the Court considered the claim abandoned in the September 29, 2003 Order. (Doc. No. 108 at 21.)

With respect to the state law claim, Bunyon asserted that he was falsely imprisoned because he was not brought before a judicial officer within the time prescribed by law. (Doc. No. 57 ¶ 7.) In the Order of September 29, 2003, the Court stated that Bunyon claimed that the City of Midville *and* Burke County are liable for this violation. (Doc. No. 108 at 21.) After further review of Bunyon's motion and supporting briefs, it is clear that Bunyon only asserted a false imprisonment claim against the City of Midville.

the Order of September 29, 2003. (Doc. No. 108.) In that Order the Court concluded that Georgia's statutes create a liberty interest, protectable by the Due Process Clause of the United States Constitution, (1) in being brought before a judge within 72 hours[4] of arrest and (2) in being allowed to post bail on a misdemeanor charge. (*Id.* at 22–27.) Although the Burke County defendants, like the Midville defendants, contend that the bench warrant under which Bunyon was arrested altered his substantive rights, this argument continues to be unavailing. Regardless of whether the warrant is denominated an arrest warrant or a bench warrant, Defendants' obligations did not change. (*See id.*) Accordingly, I will now consider whether Bunyon has produced evidence that he suffered a constitutional deprivation at the hands of Burke County.[5]

### 1. *Constitutional violations*

Bunyon asserts that Burke County is liable for his excessive detention and for the deprivation of his right to pay bail and be released. (Doc. No. 60 at 10.) According to Bunyon, "the federal courts do not make an exception with respect to the duty of a custodial agency to observe and protect the constitutional rights of its inmates." (*Id.* at 21.) Burke County, as the third party agency contracted to detain prisoners for the City of Midville, contends that 1) it did not have a responsibility to take an inmate arrested by Midville before a judicial officer; and 2) it did not have a responsibility to accept bail from such an inmate. (Doc. No. 80 at 14, 17.) Thus, it

maintains Bunyon did not suffer a constitutional violation because of its conduct.

#### a. *Failure to bring Bunyon before a judicial officer*

■ Georgia law clearly provides that "[t]he *arresting officer* shall take the arrested person before the most convenient and accessible judicial officer...." O.C.G.A. § 17–4–21 (emphasis added). More specifically, it states that "[e]very law enforcement officer *arresting* under a warrant shall exercise reasonable diligence in bringing the person arrested before the judicial officer ... within 72 hours after arrest." *Id.* § 17–4–26 (emphasis added). Although the plain language of these statutes directs the "arresting" officer to bring the detainee before a judicial officer, but omits any similar directive for custodians or third party entities entrusted with incarcerating the arrestee, I am unwilling to allow Burke County to hide behind a technicality. I cannot espouse a rule based merely on a plain reading of the statute without any consideration for justice and common sense.

Burke County was holding Bunyon pursuant to an agreement with the City of Midville whereby Midville paid Burke County a daily rate for each arrestee held at the Burke County Jail. (Anderson Dep. at 53.) While Burke County has not provided the Court with a copy of this agreement, nor disclosed any particular details about the arrangement, a relationship clearly existed between the Midville Police and Burke County. Additionally, the City of Midville has a population of 457 and

---

4. Contrary to Defendants' contentions that Bunyon's warrant was only bailable by the particular judicial officer who issued the warrant, Bunyon could have posted bail before any judicial officer. (*See* Doc. No. 108 at 22–27.)

5. Bunyon alleges that Burke County, Sheriff Coursey, Sergeant Patterson, Sergeant Saulsberry, Lieutenant Scott, and Lieutenant Bush, in both their individual and official capacities, are liable for his constitutional deprivations. However, Bunyon moved for partial summary judgment only on his claim against Burke County. (Doc. No. 57.)

four police officers and it relies upon Burke County, with its many resources and sophisticated Sheriff's Department, to house its arrestees. Burke County, depending on its agreement with Midville, may have been as much of an arresting authority as a booking agency. Therefore, it would be reasonable to impose a duty on Burke County to ensure that the City of Midville complied with its legal obligations.

■ No matter who arrested Bunyon, "The office of the sheriff is set up to enforce the laws enacted for the protection of the lives, persons, property, health, and morals of the people. A defendant in a criminal action has a right to depend on the law-enforcement agencies to protect him." *Yancey v. State,* 98 Ga.App. 797, 107 S.E.2d 265, 269–70 (1959). The Burke County Sheriff's office may very well have failed to protect Bunyon by enforcing the laws created for his protection. Although I do not know the terms of the agreement between Burke County and the City of Midville, the circumstances surrounding such agreement, the frequency in which Midville prisoners were held by Burke County, or the control the Burke County Sheriff's Department had over Midville prisoners or the Midville Police, it is possible that the responsibility to bring Bunyon before a judicial officer within seventy-two hours did not fall solely on the Midville defendants. Pursuant to the plain language of the statute, the Midville Defendants violated Bunyon's constitutional right to be taken before a judicial officer, but Burke County may have committed a similar violation by doing nothing to prevent Bunyon's excessive detention. However, whether this inaction amounted to a constitutional violation cannot be resolved until the facts surrounding the agreement between the City of Midville and Burke

County and the relationship between the Midville Police Department and the Burke County Sheriff's Department are more fully developed.

### b. Failure to accept payment of bail

■ There is a genuine dispute between the parties whether the warrant under which Bunyon was arrested was a bench warrant or an arrest warrant. However, regardless of the type of warrant, Burke County's obligation to accept Bunyon's bail did not change. Georgia law provides that the judge of any court of inquiry may establish by written order a schedule of bails, and a person charged with committing an offense "shall be released from custody upon posting bail as fixed in the schedule." O.C.G.A. § 17-6-1(f)(1). Georgia law also provides that "at no time ... shall any person charged with a misdemeanor [6] be refused bail." *Id.* § 17-6-1(b). Most importantly, for all persons who have been authorized by law or a court to be released on bail, "sheriffs and constables shall accept such bail...." *Id.* § 17-6-1(j). In the case of a bench warrant, "every person so arrested must be committed to jail until bail is tendered," and "any judicial officer or the sheriff of the county where the charge was returned may receive the bail...." *Id.* § 17-9-90.

Bunyon's bail was already determined before his arrest on March 13, 2001. (Hillis Aff. ¶ 5.) So while there was no need for Burke County to set his bail, it did have an obligation to accept the money Bunyon allegedly had with him at the time of his incarceration. Upon learning that Bunyon wanted to post his bail and had the money to do so, Sergeant Lulu Ervin was told by Captain John H. Bush that because Bunyon was arrested by the City of Midville,

---

**6.** Bunyon was charged with the misdemeanor of underage drinking. (Doc. No. 108 at 24 n.

7.)

Bunyon "had to pay [his fine] at Midville." (Ervin Dep. at 13–14.) Although Sergeant Ervin made several calls to the City of Midville in an unsuccessful attempt to inform Midville that Bunyon had enough money to post his bail (*id.* at 15), Burke County refused to accept Bunyon's money. This refusal amounted to a constitutional violation.

### 2. *Municipal Liability*

▇▇▇ Having concluded that Bunyon has produced evidence that he have suffered a constitutional violation because Burke County refused to accept his fine payment, and may have suffered a constitutional violation because Burke County failed to ensure that he was brought before a judicial officer within seventy-two hours of his arrest, I must now address whether Burke County may be held liable for this violation. A local government can only be liable for official policies or customs that violate a person's constitutional rights. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). This liability can be established in two ways. First, a plaintiff can point to an official policy or a widespread practice or custom that, although not authorized by express municipal policy, is so settled and permanent that it takes on the force of law. *Id.* In the alternative, a plaintiff can show that his rights were violated by a single decision by a "particular official who possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). It is not enough, however, for a plaintiff to identify a single act by a decisionmaker with final authority; he "must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382,

137 L.Ed.2d 626 (1997). Burke County may be liable if it had a policy or practice of not accepting bail on behalf of a detainee and not bringing an arrestee before a judicial officer within three days.

At the time of Bunyon's arrest, the Burke County Jail had a written policy in place regarding inmate bonds. (Coursey Dep. at 81–82.) It states that all eligible inmates were to be given an opportunity to post bond and that "under no circumstances will a person incarcerated for a misdemeanor be denied bond." (*Id.* at 81–83.) Sheriff Gregory T. Coursey testified that Bunyon was an eligible inmate. (*Id.* at 82.) Despite this written policy, the actual practice of Burke County was to hold an inmate arrested on a bench warrant by the City of Midville without bail until Midville sent notification that a court date had been set. (*Id.* at 84–85.) Coursey, as the Sheriff of Burke County, approved this practice and set the policy for the Jail on behalf of Burke County. (*Id.* at 11–12, 85.) Sheriff Coursey's policy was that "when a person [is] arrested on a bench warrant they are ... held until the next court date." (*Id.* at 40.) To this effect, Sheriff Coursey testified that a pretrial detainee might remain imprisoned "for six months or longer." (*Id.*)

Captain Bush, the chief jailer for Burke County and the individual charged with the responsibility for booking and bonding procedures for inmates (Bush Dep., Ex. 1), gave the following testimony:

Q. What was y'all's policy or procedure regarding a person that had been arrested on a bench warrant for a ... misdemeanor offense such as possession of alcohol by a minor?

. . .

A. He stay in jail until he go to court.

Q. Doesn't matter how long that was?

A. It was up to the agency that brung him to the jail when he go to court....

...

Q. All right. Was Leroy Bunyon given the opportunity to post bond or pay his fine?

...

A. He wasn't given that opportunity at Burke County.... That's up to Midville.

(*Id.* at 24–26.) In light of this policy, and upon learning that Bunyon had money and wanted to pay his fine for release, Captain Bush advised Sergeant Ervin that because "it was a Midville case ... [Bunyon] had to pay [the fine] at Midville." (Ervin Dep. at 13–14.)

■ Despite Burke County's written policy and Georgia statutes to the contrary, it was the Jail staff's custom and practice, authorized by Sheriff Coursey, to not accept bail on behalf of a detainee such as Bunyon and to hold him until Midville sent notification that a court date had been set, even if that was longer than seventy-two hours since his arrest. Although not authorized by express Burke County policy, this custom was so settled and permanent that it took on the force of law. Moreover, Sheriff Coursey, an "official who possesses final authority to establish municipal policy with respect to the action ordered," *Pembaur*, 475 U.S. at 481, 106 S.Ct. 1292, gave final approval to policies and procedures for the Burke County Jail (Coursey Dep. at 11). Therefore, Burke County may be held liable for the policies which led to Bunyon's due process violations.

However, until the factual disputes of 1) whether Bunyon had money on his person when he was incarcerated,[7] and 2) whether Burke County, pursuant to its agreement and relationship with the City of Midville and the Midville Police, had a duty to ensure that Bunyon was brought before a judicial officer within seventy-two hours are resolved, Bunyon's motion for partial summary judgment is DENIED.

### 3. Eleventh Amendment immunity

■ Even if Burke County may be directly liable for its practice of failing to bring detainees before a judicial officer within three days and of not accepting bail from detainees in violation of Bunyon's constitutional rights, it may be immune from suit under the Eleventh Amendment for Sheriff Coursey's and his deputies' actions.[8] The Eleventh Amendment protects a state from being sued in federal court without a state's consent. *Carr v. City of Florence*, 916 F.2d 1521, 1524 (11th Cir. 1990). Eleventh Amendment immunity also bars suits brought against employees or officers sued in their official capacities for monetary damages because those actions actually seek recovery from state funds. *Kentucky v. Graham*, 473 U.S. 159, 165–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Hobbs v. Roberts*, 999 F.2d 1526, 1528 (11th Cir.1993). "To receive Eleventh Amendment immunity, a defendant

7. As discussed in the September 29, 2003 Order, Investigator Leroy Morgan testified that Bunyon did not have any money on his person when he was arrested and incarcerated (Morgan Dep. at 32–33), but Sergeant Ervin testified that Bunyon had the money and wanted to pay his fine (Ervin Dep. at 13.) (*See* Doc. No. 108 at 31–33.)

8. Bunyon moved for partial summary judgment only on his claim that Burke County

violated his constitutional rights, but he sued the other Burke County defendants in their official capacities, which is essentially a claim against a governmental entity. *See Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Therefore, the Court and the parties have proceeded to address the potential liability of the individuals in their official capacities, although Bunyon did not expressly move for summary judgment against any Burke County defendant.

need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the state,' which includes agents and instrumentalities of the state." *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir.2003) (citations omitted). Whether a defendant is an "arm of the state" is determined by examining his or her function in a particular context. *Id.* This entails analyzing four factors: 1) how state law defines the entity; 2) what degree of control the state maintains over the entity; 3) where the entity derives its funds; and 4) who is responsible for judgments against the entity. *Id.* (citations omitted). After a lengthy review of these factors, the Eleventh Circuit has recently held that Georgia sheriffs act as "state officers" in a variety of functions. *Id.* In this case, the relevant inquiry is whether Sheriff Coursey and his deputies and jailers were acting as agents of the State in establishing and implementing bail and release procedures for inmates being held on charges pending in a municipality.

### a. How state law defines the office of sheriff[9]

█ The first factor in Eleventh Amendment analysis is how Georgia law defines the office of sheriff. The nature and purpose of the sheriff's office is to enforce the law and preserve the peace on behalf of the State. *Id.* at 1319. This includes performing specific duties, assigned by Georgia, in law enforcement, state courts, and corrections. *Id.* Sheriff Coursey's correctional duties are of particular importance in this case.

█ Georgia law controls where state offenders are incarcerated and designates that certain state offenders serve

state time in county jails. *Id.* at 1318. As a result, counties have no authority over which state offenders serve time in county jails, or what correctional duties sheriffs perform. *Id.* Specifically, county jails are used by the State to incarcerate "inmates arrested and awaiting trial in state superior courts on state felony and misdemeanor charges." *Id.* at 1315. In addition, Georgia has many policies regarding how inmates are treated and jails are operated, *see* O.C.G.A. §§ 42–4–5, –31, –32; and as discussed, *supra*, it is state law that a person charged with a misdemeanor shall not be refused bail and sheriffs are instructed to accept bail from those who are eligible. O.C.G.A. §§ 17–6–1(b), (j). Laws such as these represent the State's control where state offenders are incarcerated. *Manders*, 338 F.3d at 1318.

Although correctional duties, including the duty to accept bail, are prescribed by the State, that alone does not transform Sheriff Coursey or his deputies into state agents. As noted by the *Manders* court, "the key question is not what … powers sheriffs have, but *for whom* sheriffs exercise that power." *Id.* at 1319 n. 35. In this case, the inquiry is for whom did Sheriff Coursey and his deputies act when they elected to hold Bunyon in the Burke County Jail without bail.

It is undisputed that Sheriff Coursey was under a statutory obligation to jail state offenders awaiting trial in superior or state court on misdemeanor charges. However, Bunyon contends that he was not a state offender and not awaiting trial in superior or state court. Instead, he asserts that he was being held on behalf of the city, awaiting his appearance in the

---

9. At the outset, it is worth noting that the sheriff's office is a separate constitutional office independent from the county where it is located. *Manders*, 338 F.3d at 1310. The sheriff's authority and duties are derived di-

rectly from the state, counties cannot control nor affect the sheriff's office, and the sheriff and his deputies are not county employees. *Id.* at 1310–11.

Recorder's Court of the City of Midville. (Doc. No. 110 at 10.) He claims there is no statute mandating that Sheriff Coursey accept Bunyon as an inmate. Therefore, Sheriff Coursey was not obligated to incarcerate Bunyon on behalf of the State, but was in fact holding Bunyon on behalf of Burke County pursuant to its agreement to do so with the City of Midville.[10] As a result, he maintains that Sheriff Coursey was acting as an agent of Burke County, not Georgia, when he created and promulgated the bail policy at issue.

▆▆▆▆▆ Georgia law provides that "any sheriff ... whose duty it is to receive persons charged with or guilty of an indictable offense who refuses to receive and take charge of such a person shall ... be guilty of a misdemeanor...." O.C.G.A. § 42–4–12. Pursuant to this statute, the sheriff has a duty to accept persons charged with an indictable offense, and by implication, a right to refuse to receive any municipal prisoner who is not charged with an offense against the state. *Tate v. National Surety Corp.*, 58 Ga.App. 874, 200 S.E. 314, 315 (1938). Although Bunyon was originally issued a citation and ordered to appear before the City of Midville's Recorder's Court, he was not charged with violation of a municipal ordinance. He was charged with underage possession and consumption of alcohol in violation of O.C.G.A. §§ 3–3–23, –23.1, which is an indictable offense. Thus, contrary to Bunyon's contention, Sheriff Cour-

sey was under an obligation, imposed by the State, to accept Bunyon. The fact that the original charge was to be heard in municipal court does not affect this duty.[11] Based on the fact that Sheriff Coursey's authority over inmates such as Bunyon flow from the State and not Burke County, and those functions and duties pertain chiefly to affairs of the State, *see Manders*, 338 F.3d at 1319 n. 35, I conclude that this first factor weighs strongly in favor of Eleventh Amendment immunity.

### b. Where state law vests control

The second factor examines where Georgia law vests control. Clearly, the State possesses control over a sheriff's bail and detention policy. *See* O.C.G.A. §§ 17–4–21, 17–4–26, 17–6–1. In contrast, Burke County has no involvement in Sheriff Coursey's bail policy at the jail. Although Burke County has "obligations involving the jail structure and inmates' food, clothing, and medical necessities," such duties involve wholly separate and distinct matters from the bail policy for City of Midville arrestees. *Manders*, 338 F.3d at 1322. Because of Georgia's direct control over Sheriff Coursey's duty to accept bail and bring a detainee before a judicial officer within seventy-two hours, and Burke County's total lack thereof, this control factor weighs heavily in favor of Eleventh Amendment immunity.

---

**10.** Pursuant to the agreement, the City of Midville paid Burke County a daily rate for each arrestee held at the Burke County Jail. (Anderson Dep. at 53.)

**11.** Under Georgia law, a violation of a municipal ordinance is not an offense against the laws of the State. *Beaman v. City of Peachtree City*, 256 Ga.App. 62, 567 S.E.2d 715, 717 (2002) (citations omitted). A municipality, however, may legally contract for the use of the county jail as a place for confining municipal prisoners. *Tate v. National Surety Corp.*,

58 Ga.App. 874, 200 S.E. 314, 315 (1938) (citations omitted). Where such a contract exists, the sheriff will have a duty to receive prisoners delivered to his jail by municipal officers. *Id.* Where incarceration of municipal prisoners is by some private arrangement between the sheriff and arresting agency, without ratification by the county, however, there is no similar duty. *Id.* Since Bunyon was charged with a violation of state law, not a municipal ordinance, I need not address whether Sheriff Coursey had a legal contractual duty to accept Bunyon as a prisoner.

### c. Funds

The third factor for determining whether Sheriff Coursey has immunity as a state actor is where the entity derives its funds. The State pays a per diem rate for *convicted* state offenders incarcerated in the county jail, while the county pays for pretrial offenders. *Manders,* 338 F.3d at 1323 n. 42 (citing O.C.G.A. § 42–5–50(d)). The county also provides funds to maintain the jail structure, provide necessities to inmates, and pay the salaries of Sheriff Coursey and his deputies. *Id.* at 1323 (citing O.C.G.A. §§ 36–9–5, 42–5–2(a), 15–16–20, 45–4–7.) However, while Burke County bears most of the burden of funding the sheriff's office and the jail, it is because the State so mandates; and Burke County cannot dictate how Sheriff Coursey spends his budget. *Id.* at 1323 (citations omitted).

In this case, Bunyon was not a convicted state offender, so state funds would not have been directly involved. Instead, he was a pre-trial offender and detained pursuant to an agreement with the City of Midville whereby Midville paid Burke County a per diem rate for his incarceration. (Anderson Dep. at 53.) This agreement has not been produced for the Court, and I have not been provided with any evidence regarding the amount Midville paid for each prisoner per day. Although I do not know if this amount was adequate to pay *all* expenses associated with an inmate's incarceration, it is reasonable to infer that Bunyon's detention was paid for primarily by the City of Midville. Depending on the per diem rate, however, it is possible that Burke County may have had some unreimbursed costs related to Bunyon's incarceration. It is Burke County's burden to establish such expenditures. As Burke County has failed to show whether it actually spent any of its own funds on Bunyon's incarceration, as mandated by the state, I am hesitant to find

any state involvement as it pertains to this aspect of the *Manders* analysis.

### d. Liability for and payment of adverse actions

The final factor in the Eleventh Amendment analysis is the source of funds that will pay any adverse judgment against Sheriff Coursey or his deputies in their official capacities. Burke County would not pay a damages award against Sheriff Coursey because "a defendant county cannot be held liable for the tortious actions or misconduct of the sheriff or his deputies." *Id.* at 1326 (citations omitted). Similarly, counties are not required to give sheriffs money to pay judgments against them in civil rights actions. *Id.* There is no law, however, explicitly requiring the State to pay an adverse judgment against the sheriff in his official capacity either. *Id.* Apparently, Sheriff Coursey would have to pay any adverse judgment out of the sheriff's office budget, and as a result, both county and state funds would be implicated by an adverse judgment. Sheriff Coursey would need an increased budget from the county for his office and an increased daily per diem rate for convicted detainees held in the Burke County Jail from Georgia. *Id.* at 1327. When faced with this dual county/state obligation, the Eleventh Circuit noted that the State's sovereignty and integrity are affected when lawsuits interfere with a state function, and therefore, "at a minimum, the liability-for-adverse-judgment factor does not defeat [Sheriff Coursey's] immunity claim." *Id.* at 1328, 1329.

Although not a bright line decision, weighing all of the factors discussed above, I find that Sheriff Coursey is entitled to Eleventh Amendment immunity. His authority over Bunyon flowed directly from the state, his functions and duties pertained chiefly to affairs of the state,

and the state directly controlled his duty to accept bail and release prisoners within seventy-two hours of arrest. That the state may not have provided funds for Bunyon's incarceration and may not provide much money for a judgment against him does not preclude this finding. Sheriff Coursey, in his official capacity, was acting as an arm of the state in establishing bail and release policies at the jail, and is therefore entitled to Eleventh Amendment immunity.

Like Sheriff Coursey, his deputies are also entitled to Eleventh Amendment immunity. Although *Manders* involved only the immunity of the Sheriff in his official capacity, its factors are similarly applicable to deputy sheriffs as well. *See Carr v. City of Florence*, 916 F.2d 1521, 1525–26 (11th Cir.1990) (holding Alabama deputy sheriffs are state officials entitled to Eleventh Amendment immunity after considering three factors: 1) relationship between sheriffs and deputies; 2) control that county exercises over sheriffs and deputies; 3) whether damages award against deputies in official capacities would be paid with state funds); *Lancaster v. Monroe County, Al.*, 116 F.3d 1419, 1429–30 (11th Cir.1997) (holding Alabama jailers are state officials entitled to Eleventh Amendment immunity under same three factors).

First, deputies are the legal extension of the sheriff because they act as the sheriff's agents and can perform any act within the sheriff's authority. *Carr*, 916 F.2d at 1526; O.C.G.A. §§ 15–16–23, 36–8–5. Second, as the *Manders'* court explained, by Georgia law the Sheriff's *office* is independent from Burke County and the county has no control or authority over Sheriff Coursey's deputies at the jail. *Manders*, 338 F.3d at 1311 ("Sheriffs alone hire and fire their deputies. *See* O.C.G.A. § 15–16–

23. Deputies, including those serving as jailers, are employees of the sheriff and not the county."); *id.* at 1319 n. 35. Third, as with an adverse judgment against Sheriff Coursey, any damage award would have to be paid by the Sheriff's office, which, as explained *supra*, implicates both state and county funds.

Based upon the foregoing, Sheriff Coursey and his deputies are entitled to Eleventh Amendment immunity. Even if Burke County is directly liable for its unconstitutional policy and practice of denying bail and release to detainees, it is not liable for any constitutional violations related to these policies committed by Sheriff Coursey and the other Burke County defendants.

**B. Deliberate Indifference to Medical Care**

■ Bunyon alleges that the Burke County defendants were indifferent to his serious medical care needs while he was incarcerated in the Burke County Jail. A claim that a pre-trial detainee has been denied adequate medical care is properly addressable under the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Eleventh Circuit Court of Appeals has held that "in regard to providing pretrial detainees with basic necessities as food, living space, and medical care the minimum standard allowed by the Due Process Clause is the same as that allowed by the Eighth Amendment for convicted persons." *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir.1985).[12] Because the Eleventh Circuit has held that the minimum standard for the provision of basic necessities, including medical care, is

---

**12.** The Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

the same for convicted prisoners under the Eighth Amendment and for pre-trial detainees under the Fourteenth Amendment, it is appropriate to examine Eighth and Fourteenth Amendment decisional law concerning Bunyon's claim. *See Lancaster v. Monroe County, Ala.,* 116 F.3d 1419, 1425 n. 6 (11th Cir.1997).

■ To state a cognizable claim for indifference to medical needs, a pre-trial detainee "must allege acts or omissions sufficiently harmful to evidence *deliberate indifference* to *serious* medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (emphasis added); *see also Hamm,* 774 F.2d at 1574–75 ("To recover on [a] claim of inadequate medical care, [the plaintiff has] to prove that jail officials engaged in acts or omissions sufficiently harmful to evidence *deliberate indifference* to [his] *serious* medical needs.") (internal marks and citation omitted) (emphasis added). The Eleventh Circuit has explained that the "deliberate indifference" standard has an objective and a subjective component. *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1186 (11th Cir.1994). Both components of deliberate indifference must be met for a plaintiff's claim to succeed.

### 1. The Objective Component

■ The objective component of deliberate indifference concerns the "seriousness" of the injury or deprivation of which a plaintiff suffered. *Hamm,* 774 F.2d at 1574 ("[W]ith reference to medical needs, [prison officials] must not be deliberately indifferent to detainees' serious medical needs."). The Supreme Court has held that deliberate indifference to medical needs "amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eleventh Circuit has further defined a serious medical need to be one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill,* 40 F.3d at 1186 (quoting *Laaman v. Helgemoe,* 437 F.Supp. 269, 311 (D.N.H. 1977)). In addition, "the seriousness of an inmate's medical needs also may be decided by reference to the effect of delay in treatment. Where delay results in an inmate's suffering a life-long hardship or permanent loss, the medical need is considered serious." *Id.* at 1188.

Bunyon has produced evidence that his injury was severe. While in the Burke County Jail, Bunyon developed an epidural hematoma which exerted pressure on his spinal cord. (Doc. No. 82 at Ex. D ¶ 15 (Aff. of Bruce Jones Nixon, M.D.).) The pressure on his spinal cord built to such a point that Bunyon began to experience neurological symptoms beginning with sensory loss and finally resulting in paralysis. (*Id.* ¶¶ 6, 7.) "At the time of surgery, Mr. Bunyon was paralyzed to the point that he could no longer use his hands, was paraplegic, and exhibited no rectal tone." (*Id.* ¶ 7.) After surgery, Bunyon underwent rehabilitation at the Shepard Spinal Center in Atlanta. (Bunyon Dep. at 130–31, 140.) Bunyon testified that he still walks with a limp, has done no work for wages since his injury, (*id.* at 144) and now collects social security benefits (*id.* at 136). Furthermore, Bunyon has produced evidence that he could not feel his legs or even walk to the bathroom. (Kirkland Dep. at 14.) Bunyon has satisfied the objective component of the test.

### 2. The Subjective Component

The subjective component of deliberate indifference concerns the state of mind of the defendant whose acts or omissions are alleged to be the basis of the plaintiff's claim. *Hill,* 40 F.3d at 1186. The Eleventh

Circuit has "consistently held that knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference." *Id.* at 1186 (internal marks and citation omitted). The state of mind required is thus greater than mere negligence. *See Farmer v. Brennan,* 511 U.S. 825 at 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, I will now examine they subjective component of this claim with respect to the individual defendants.

### a. *Sheriff Coursey, Captain Bush and Lieutenant Scott*

▮ Bunyon concedes that these officers did not have personal involvement in his deprivation, but he seeks to hold them liable because they "were responsible for creating and enforcing the inmate medical care policies." (Doc. No. 82 at 29.) Liability may be imposed on a supervisor due to the existence of an improper policy or from an absence of a policy that results in deliberate indifference to constitutional rights. *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir.1991). According to Bunyon, the Burke County Jail did not have a written policy for furnishing medical assistance to inmates;[13] and "an unwritten policy existed that was grossly inadequate . . . such that it constituted a deliberate indifference to the essential medical needs of the Plaintiff." (Doc. No. 82 at 14, 29.) Bunyon attributes his injury to two alleged deficiencies: 1) failing to provide formal training to jail staff about the inmate medical care policy; and 2) failing to provide on-site medical care at the Jail, or in the alternative, inadequate staffing.

Sheriff Coursey sets the policy for the Burke County Jail. (Coursey Dep. at 11–13.) Thus, neither Captain Bush nor Lieutenant Scott are liable on a theory that

they *created* a constitutionally infirm policy. However, they may be liable for enforcing the policy if it was constitutionally deficient. Therefore, before I can determine if any of these three defendants are liable, I must examine whether the inmate medical policy in effect at the Burke County Jail during Bunyon's detention resulted in a deprivation of his constitutional rights.

Although the defendants claim that the Jail had a written policy regarding medical services for inmates (Doc. No. 103 at 8), the question of whether Burke County had a written policy in place at the time of Bunyon's injury is unresolved. (Scott Dep. at 12–13 (indicating that a policy concerning medical care had been written, but he is not sure it was ever approved).) Thus, I turn to the question of whether, without a written policy, the *de facto* policy at the Burke County Jail led to inadequate medical care of Bunyon.

Sheriff Coursey testified that the first step in dealing with a medical complaint was to have a jail staff member investigate the complaint. (Coursey Dep. at 24.) All jail staff members were required to have CPR and first-aid training. (*Id.;* Haynes Dep. at 61; Patterson Dep. at 27–28.) Sheriff Coursey also testified that if an inmate made continuous complaints, the staff member should report it to either the sergeant or the nurse and that he would expect there to be no delay. (Coursey Dep. at 32–33, 89.) The sergeant would then notify the EMT or the nurse. (*Id.* at 89.) Sheriff Coursey testified that jail staff could contact the EMTs in an emergency without the nurse's approval. (*Id.* at 90.) If the nurse was not available, the jail staff had to make a decision about whether to call the EMT or not. (*Id.* at 91.)

---

**13.** A plaintiff may demonstrate a pattern or practice of a governmental entity with evidence of the absence of a particular policy where one should be in place. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

The policy Lieutenant Scott was enforcing was very similar, if not identical to the policy set forth by Sheriff Coursey.

Q. [W]hat was the policy that was in practice even if there wasn't any written policy? . . .

. . .

A. If an inmate have a problem he would notify . . . the shift sergeant. The shift sergeant would come back and . . . see what's going on. And if the nurse was there if it was the daytime we would call the nurse and let her know the situation.

. . .

Q. Okay, so the—so there would be a call to the sergeant at the booking desk. That sergeant would come out and take a look and then make a determination whether something more need to be done?

A. Right. The best of his ability. We don't have medical training, so the majority of the times we would call EMA regardless of the situation. EMA would come and check them and we don't like to make the call.

(Scott Dep. at 13–15.) Like Sheriff Coursey, Lieutenant Scott stated that ongoing complaints would necessitate an inspection by a jail staff member. (*Id.* at 19.)

Consistent with the above testimony, Captain Bush stated that when an inmate complains, the proper procedure is to call the nurse or the emergency medical assistant ("EMA"). (Bush Dep. at 8.) Captain Bush did take his notion of the policy a step further than Lieutenant Scott or Sheriff Coursey to say that the jail staff should *always* notify a nurse or the EMA if an inmate complained. (*Id.* at 9, 10.) If the nurse was not available, a jailer would call the EMA. (*Id.* at 11.) Captain Bush also added that the inmates fill out sick slips if they can and those are delivered to the nurse, if she is available. (*Id.* at 13.)

■ These practices fail to reveal deliberate indifference to Bunyon's medical care. First, I am unwilling to state that the Jail's policy of having a nurse on-call and transporting prisoners to local hospitals when they are in need of medical attention not available at the Jail is deficient. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 386, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Young v. City of Augusta, Ga.,* 59 F.3d 1160, 1171 (11th Cir. 1995). Second, Bunyon has not established that a policy of deficiencies in staffing or training caused him to be denied necessary medical care. *See Thomas v. Town of Davie,* 847 F.2d 771, 773 (11th Cir.1988) (citations omitted).

In order to prevail, Bunyon must be able to show that the need for more or different training is "so obvious" that it is "likely to result in the violation of constitutional rights. . . ." *City of Canton, Ohio,* 489 U.S. at 390, 109 S.Ct. 1197. The need of a particular type of training may be obvious either where a pattern of constitutional violations exists such that the defendant knows or should know that corrective measures are needed, or "where jailers face clear constitutional duties in recurrent situations." *Young,* 59 F.3d at 1172.

It is undisputed that Jail staff are charged with ensuring that an inmate's medical needs are met while he or she is detained at the Burke County Jail. Thus, the need to train personnel in the constitutional requirements of providing adequate medical care can be said to be so obvious that failure to do so could properly be characterized as deliberate indifference to constitutional rights. *City of Canton, Ohio,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197. However, the evidence in this case indicates that the Burke County Jail did train its staff and that its training included first-aid and CPR instruction. There is no evidence that any member of the Jail staff

was unaware of what steps to follow when an inmate needed medical attention.

Furthermore, Bunyon has produced no evidence of widespread abuse or problems with the medical care administered by the Burke County Jail. *See Bozeman v. Orum,* 199 F.Supp.2d 1216, 1234 (M.D.Ala.2002.) Similarly, there is no evidence of any prior incident that would have given these defendants notice of a need for additional or different training. Although it is not necessary to show that the policy in question resulted in a prior denial of medical care, *Anderson v. City of Atlanta,* 778 F.2d 678, 686 n. 11 (11th Cir.1985), policymakers must have had "actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." *City of Canton, Ohio,* 489 U.S. at 396, 109 S.Ct. 1197. Unlike cases where an entity's policy has been found to result in constitutional violations, there is no evidence that a practice of inadequate staffing or training was the legal cause of Bunyon's injury. *See, e.g., Anderson,* 778 F.2d at 686 (defendant had made a conscious decision not to increase staff despite repeated complaints of inadequate staffing).

Having found that the inmate medical care policies in place at the time of Bunyon's incarceration met minimum constitutional standards, the defendants' motion for summary judgment as to whether Sheriff Coursey, Lieutenant Scott, and Captain Bush, as supervisors of the Burke County Jail, were deliberately indifferent to Bunyon's medical care is **GRANTED.**

### b. *Sergeants Patterson and Saulsberry*

Bunyon has produced evidence that both of these defendants knew of his deteriorating condition and chose to ignore his complaints, particularly on the critical days of March 23 and 24, 2001.

Thaddeus Kirkland ("Kirkland"), a fellow inmate of Bunyon, gave the following testimony about Bunyon's condition and Sergeant Patterson's and Sergeant Saulsberry's knowledge of it:

A. [T]hroughout that day [Bunyon] was just—it was just—his condition got worse. We had to feed him ourselves. He couldn't feed himself.... [T]he trustees have to bring hot water on the cell block for us to cook noodles with and we-we took some hot water and we saw how he would react to the feeling of hot water on him. And he said he didn't feel it. And then they took ice and tried to see how he will react to that and he didn't feel it. And this was after 6:00 so that means Saulsberry and Patterson had came back on shift and we started back to complain to them.

. . .

Q. Did [Bunyon] flinch or move it away from him?

A. He couldn't move. He couldn't feel it at all. He couldn't flinch.

. . .

Q. Was that conveyed to Saulsberry?

A. Yes, sir.

Q. Was it also conveyed to Patterson?

A. Yes, sir.

Q. What reaction did you get to [sic] from those gentlemen?

A. [I]t was like neither one of them cared and we—we kept complaining and complaining and they just ignored and ignored. It seemed like the more we complained the more they ignored.

. . .

A. I don't mean to be too explicit but he couldn't use the bathroom, so he-he used it on hisself [sic].

Q. Okay. He soiled himself?

A. Yea, he urinated and defecated on hisself [sic] because he couldn't get to the bathroom.

Q. Okay. Did you point that out to the guards?

A. Yes, sir.

Q. What did they say to do about that?

A. Ignore. They didn't say anything. They ignored it.

(Kirkland Dep. at 13–16.) Kirkland states numerous times that Sergeants Patterson and Saulsberry were aware of Bunyon's condition, and his version of events is largely corroborated by fellow inmates Tracy Attaway (Attaway Aff. ¶¶ 7–16), Christopher Dukes (Dukes Aff. ¶¶ 5–19), and Joe Hughes (Hughes Dep. at 8–13).[14]

■ The defendants adamantly contest the testimony of Kirkland, Attaway, Dukes, and Hughes, and ask the Court to disregard the inmates' affidavits and depositions as directly contradictory of Bunyon's testimony.[15] (Doc. No. 103 at 2–6.) The defendants contend that, according to Bunyon's own testimony, he was not having any problems with his legs as late as 9:00 p.m. Saturday night. (Bunyon Dep. at 129–30.) They also claim Sergeants Patterson and Saulsberry did not know of Bunyon's pain or problems with his back and legs until approximately 11:00 p.m. that evening. (Doc. No. 47 at 26.) According to Sergeant Saulsberry, he did not receive any complaints from either Bunyon nor other inmates until approximately 11:00 p.m. Saturday (Saulsberry Dep. at 45–46), and Sergeant Patterson cannot remember if he was notified of Bunyon's condition before 11:00 p.m. (Patterson Dep. at 93).

Although Bunyon's recollection of Saturday's events are not identical to other inmates' testimony, this does not transform the contested affidavits and depositions into "sham" testimony. Bunyon stated that he was confused about the timing of events on Saturday (Bunyon Dep. at 129–30), and given the circumstances, his confusion would be understandable. In the face of these factual disputes, I conclude that Bunyon has produced sufficient evidence to raise a triable issue of fact as to whether Sergeants Patterson and Saulsberry had knowledge of Bunyon's need for medical attention, yet intentionally refused to provide medical care. Therefore, the defendants' motion for summary judgment as to whether Sergeants Patterson and Saulsberry were deliberately indifferent to Bunyon's medical care is **DENIED.**

### 3. Qualified Immunity

■ Having determined that Bunyon has established a claim for deliberate indifference, I now turn to the question of whether Sergeants Patterson or Saulsberry may be entitled to the protection afforded under qualified immunity. The law on qualified immunity has been set forth in the Order of September 29, 2003. (Doc. No. 108 at 37–40.) As explained in that Order, for a defendant to be entitled to qualified immunity, his official action must be "reasonable in light of clearly established law." *Nevada v. Hicks*, 533 U.S. 353, 400, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). The relevant question, therefore, is whether the state of the law gave the defendants notice that their treatment of Bunyon was unconstitutional. *Hope v.*

14. The evidence against Sergeants Patterson and Saulsberry evidencing deliberate indifference to his medical needs is also relevant to the question of whether they intentionally inflicted emotional distress on Bunyon as discussed further in that section, *infra*.

15. The defendants ask the Court to disregard the statements of Dukes, Attaway, Kirkland, Hughes, and Greg Jordan. (Doc. No. 13 at 2–6.) While I have relied on statements made by Dukes, Attaway, Kirkland, and Hughes, I did not consider Jordan's statements for purposes of this motion.

*Pelzer,* 536 U.S. 730, 739–40, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

 At the time of Bunyon's incarceration, the law clearly established that a jail official violates a prisoner's Fourteenth Amendment right to due process if he acts with deliberate indifference to the prisoner's serious medical needs. *See Lancaster v. Monroe County,* 116 F.3d 1419, 1425 (11th Cir.1997); *Seals v. Shah,* 145 F.Supp.2d 1378, 1384 (N.D.Ga.2001). As a result, "the defense of qualified immunity is not available to a defendant guilty of deliberate indifference to serious medical needs." *Seals,* 145 F.Supp.2d at 1384. Although the defendants contend that the law was not clearly established as to Bunyon's specific medical condition, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope,* 536 U.S. at 741, 122 S.Ct. 2508. If Sergeants Saulsberry and Patterson knew that Bunyon had a serious medical need, they should have known from clearly established law that a decision to withhold or delay treatment amounted to deliberate indifference, and they should not be afforded immunity from suit. As such, the defendant's motion is **DENIED.** The issue of whether Sergeants Saulsberry and Patterson are entitled to qualified immunity will go to trial.

### 4. *Burke County Liability* [16]

 A local government may only be liable under § 1983 when execution of its policy or custom inflicts injury on the plaintiff. *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To make this showing, a plaintiff must prove that through a deliberate and official policy of some sort the local governmental entity was the moving force behind the constitutional tort. *Id.* at 691–95, 98 S.Ct. 2018; *Brown,* 520 U.S. at 403–04, 117 S.Ct. 1382.

Bunyon makes two important contentions: (1) the Burke County Jail did not have a written policy regarding medical care at the time Bunyon was injured and (2) the unwritten policy in place at the Burke County Jail was deficient and, thus, lead to Bunyon's injury. (Doc. No. 82 at 20.) According to Bunyon, the lack of medical professionals at the Burke County Jail "resulted in substantial periods of time during which the inmates were at the mercy of medically-untrained personnel who were entrusted by Jail officials to make medical decisions. The policy dangerously and obviously posed the risk that necessary inmate medical care would be delayed or denied, and, in fact, caused the delay in providing the Plaintiff emergency medical attention." (*Id.* at 21.)

Burke County contends that there is no evidence of "a pattern, practice, or policy by Burke County or on the part of the Sheriff's office of denying medical care to inmates." (Doc. No. 47 at 15.) Furthermore, Burke County asserts that Bunyon has produced no evidence of a similar incident in which Burke County allegedly failed to respond to an inmate's serious medical need.

 As discussed at length, *supra,* Bunyon has failed to show that the Jail's written policy or *de facto* practice created the risk that medical attention would be delayed or denied. Although the individu-

---

**16.** Unlike Bunyon's due process claim against Burke County, the defendants do not contend that Burke County should be immune from suit under the Eleventh Amendment based on the Eleventh Circuit's holding in *Manders.* (*See* Doc. No. 109 at 2–3 ("the medical care issue can be decided ... without consider-

ation of *Manders* ....").) Therefore, I will consider whether Burke County is liable for deliberate indifference to medical care using the traditional municipal liability analysis which has been set forth herein in section (A)(2), *supra,* and in the Order of September 29, 2003 (Doc. No. 108).

al defendants' conduct may have constituted a violation of Bunyon's constitutional rights, there is no proof that the Burke County policy was the proximate cause of his injuries. Therefore, Burke County is not liable for the denial of essential medical care to Bunyon and the defendants' motion for summary judgment is **GRANTED.**

## C. Remaining Claims

### 1. *Intentional Infliction of Emotional Distress* [17]

■ For Bunyon's emotional distress claim to succeed, he must show that (1) the allegedly wrongful conduct was intentional or reckless; (2) that the conduct was extreme and outrageous; (3) that there is a causal connection between the wrongful conduct and the plaintiff's emotional distress; and (4) that the emotional distress was severe. *Whalen v. Isaacs,* 233 Ga. App. 367, 504 S.E.2d 214, 216 (1998). The Burke County defendants contend that summary judgment is appropriate because Bunyon has produced insufficient evidence that their conduct is so outrageous that an IIED claim will lie. (Doc. No. 47 at 39.)

■ "If there is evidence from which reasonable persons can find severe emotional distress resulting from extreme and outrageous conduct, this issue is one for the jury." *Blockum v. Fieldale Farms Corp.,* 275 Ga. 798, 573 S.E.2d 36, 39 (2002). In determining whether Sergeant Patterson's and Sergeant Saulsberry's conduct is outrageous enough to support an emotional distress claim, I must determine of what information about Bunyon's condition they had and what actions they took. Bunyon has produced evidence that Sergeants Saulsberry and Patterson likely were aware of his deteriorated condition. If they knew that Bunyon could not move,

that he had defecated and urinated on himself, and that he could not feel sensations in his legs, but nonetheless left him to suffer, then an emotional distress claim would succeed. Sergeants Saulsberry and Patterson, of course, deny Bunyon's allegations, but a determination of the information they possessed and the actions they took or did not take is for the jury to decide. As a result, the defendants' motion to grant summary judgment on the emotional distress claim is **DENIED.**

### 2. *Medical Expenses*

Bunyon asserts that pursuant to O.C.G.A. § 42–5–2, Burke County is responsible for medical expenses incurred as a result of [his] injuries...." (Doc. No. 28 ¶ 87.) Burke County concedes that Bunyon was in its custody at the time he sustained his injuries, and that "Burke County may be responsible for medical expenses incurred by Plaintiff Bunyon during his incarceration." (Doc. No. 47 at 38.) However, Burke County contends there is no evidence in the record that Bunyon has expended any personal sums for his medical care. (*Id.*) According to Burke County, Medicare paid all of Bunyon's expenses and, thus, Bunyon cannot recover expenses he did not pay. (*Id.*)

Bunyon counters that (1) Burke County is responsible for his medical care, (2) the County's last-hour release of Bunyon on his way to the hospital in Augusta does not negate its responsibility for his medical expenses, and (3) even though Medicare paid most or all of Bunyon's medical expenses, these payments fall within the collateral source rule. (Doc. No. 82 at 30.)

■ Georgia law places the responsibility for an inmate's medical care on the county. *See Cherokee County v. North*

---

17. In asserting a claim of intentional infliction of emotional distress, Bunyon has limited

his argument to Defendants Saulsberry and Patterson. (*See* Doc. No. 82 at 31–32.)

*Cobb Surgical Assocs., P.C.,* 221 Ga.App. 496, 471 S.E.2d 561, 564 (1996); O.C.G.A. § 42–5–2 ("[I]t shall be the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention...."). Thus, Burke County is responsible for the medical care of those incarcerated in its jail.

Testimony in this case indicated that when Bunyon's injury became serious enough to require hospitalization and transfer to The Shepard Spinal Center in Atlanta, Georgia, Bunyon was released from incarceration. (Anderson Dep. at 44–46); Coursey Dep. at 70 (stating that he released Bunyon "because I don't want the county to be responsible for a lot of medical bills"). In fact, Bunyon was on his way to the hospital when he was released. (Coursey Dep. at 71.)

The Georgia Court of Appeals has stated that a county's last-minute release of a detainee will not obviate its need to pay his medical expenses. *See Macon–Bibb County Hosp. Auth. v. Houston County,* 207 Ga.App. 530, 428 S.E.2d 374 (1993). In *Macon–Bibb County Hospital,* a comatose pre-trial detainee's "release was ordered in an admitted attempt to reduce Houston County's liability for [his] medical and hospital expenses." *Id.* at 374. The county attempted to argue that O.C.G.A. § 42–5–2 did not apply because it only applied to convicted prisoners, not pre-trial detainees. *Id.* at 375–76. The court rejected this argument and further held that "[t]he county's attempt to reduce its liability by ... [releasing the pre-trial detainee] when he was obviously not physically capable of being released, was an improper attempt to circumvent the county's statutorily imposed responsibility for [his] care." *Id.* at 376. The *Macon–Bibb County Hosp.* case instructs that Burke County may be liable for Bunyon's medical expenses, despite its

attempt to release Bunyon on his way to the hospital.

The final question is whether Bunyon may maintain his claim for medical expenses, even though he apparently concedes that Medicare paid for them. (Doc. No. 82 at 30 ("Burke County's assertion that Medicare's payment of Plaintiff's medical expenses obviates its responsibility under § 42–5–2 is also without merit. It is well-established that Medicare benefits fall within the collateral source rule, thus effectively denying Burke County any right of set-off as to its statutory financial obligation.").)

■■■■ Georgia law provides that a plaintiff may still prove damages that were paid by an outside source, such as Medicare. *See Candler Hosp., Inc. v. Dent,* 228 Ga.App. 421, 491 S.E.2d 868 (1997). In *Dent,* the court addressed a case in which a plaintiff sought to prove medical expenses, though Medicare paid all of the plaintiff's hospital bills, less approximately $70,000. The hospital wanted to exclude the $70,000 write-off, arguing that this amount was not a collateral source. The court responded as follows:

> The common law rule in Georgia bars the defendant from presenting any evidence as to payments of medical, hospital, disability income, or other expenses of a tortious injury paid for by a plaintiff, governmental entity, or third party and taking credit towards the defendant's liability in damages for such payments.... The plaintiff can prove all damages, argue, itemize on a blackboard, and receive a charge on the recovery of such damages....

*Dent,* 491 S.E.2d at 869. However, despite this governing rule, Bunyon may not receive a double recovery; *i.e.,* he may not have his expenses paid by Medicare and then collect reimbursement for these expenses. As the *Dent* court explained:

Georgia, as part of its common law and public policy, has always prohibited a plaintiff from a double recovery and satisfaction of damages.... Where damages are special and ascertainable and the defendant or its privies, indemnitor, or insurers have paid the medical expenses prior to judgment, in whole or in part, a set-off against such special damages, specifically identified and awarded in the verdict, is mandated to prevent a double recovery.

*Id.* Bunyon's citation to O.C.G.A. § 42–5–2 puts Burke County on notice that it is responsible for his injuries. However, regardless of whether Bunyon cites to § 42–5–2 or not, he must still prove his medical expenses and have a jury determine them. Burke County would then be allowed to demonstrate that these expenses were paid by an outside source, assuming a special verdict rather than a general verdict were returned by the Jury, thereby preventing a double recovery. As a result, the defendants' motion for summary judgment on this claim is **DENIED.**

### 3. *Punitive Damages*

 The Burke County defendants contend that they are entitled to summary judgment on Bunyon's claims for punitive damages because he cannot prove that their "actions were malicious, oppressive, or consciously indifferent to Plaintiff Bunyon or his injuries." (Doc. No. 47 at 41; *see* O.C.G.A. § 51–12–5.1.) First, Bunyon cannot seek punitive damages against Burke County because "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *see also Colvin v. McDougall,* 62 F.3d 1316, 1319 (11th Cir.1995). Furthermore, the Georgia Court of Appeals has held that a governmental entity, even when it has general liability insurance, may not be sued for punitive damages. *See Groves v. City of*

*Atlanta,* 213 Ga.App. 455, 444 S.E.2d 809, 812 (1994).

 Burke County aside, Bunyon is permitted to seek punitive damages against any defendant in his individual capacity. Having found that there are factual issues that must be determined by a jury concerning what information Sergeants Saulsberry and Patterson had about Bunyon's medical condition and the responsive actions they did or did not take, summary judgment as to these two defendants would be premature. However, since supervisory liability cannot be imputed to Sheriff Coursey, Captain Bush, Lieutenant Scott, Bunyon may not seek punitive damages against these three defendants.

As a result of the foregoing, the defendants' motion for summary judgment on Bunyon's claim for punitive damages against Burke County, any Burke County defendant in his official capacity, or Sheriff Coursey, Lieutenant Scott, or Captain Bush in their individual capacities is **GRANTED;** and summary judgment as to Bunyon's claim for punitive damages against Sergeants Saulsberry and Patterson in their individual capacities is **DENIED.**

## IV. CONCLUSION

For reasons stated more fully above, the Burke County defendants' motion for summary judgment (Doc. No. 45) is **GRANTED IN PART** and **DENIED IN PART.** Furthermore, Bunyon's motion for partial summary judgment (Doc. No. 57) is **DENIED.** The following claims will proceed to trial: 1) Burke County's liability for refusing to bring Bunyon before a judicial officer within seventy-two hours; 2) Burke County's liability for failing to accept Bunyon's bail posting; 3) the Burke County defendants' individual liability for failing to bring Bunyon before a judicial officer and

for refusing to accept his bail; 4) Sergeants Patterson's and Saulsberry's liability for deliberate indifference to Bunyon's medical care; 5) Sergeants Patterson's and Saulsberry's liability for intentional infliction of emotional distress; 6) Bunyon's medical expenses; and 7) punitive damages against Sergeants Patterson and Saulsberry.